# United States Court of Appeals
## For the First Circuit

No. 08-2554

ROBERT WALDRON AND CHRISTOPHER MILLS,

Plaintiffs, Appellees,

v.

GEORGE WESTON BAKERIES INC. AND GEORGE WESTON BAKERIES
DISTRIBUTION INC.,

Defendants, Appellants.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Howard, Selya and Ebel,[*] Circuit Judges.

Catherine R. Connors, with whom James R. Erwin, Katharine I.
Rand, and Pierce Atwood LLP were on brief, for appellants.
Patrick J. Mellor, with whom Strout & Payson, P.A. was on
brief, for appellees.

June 19, 2009

---

[*]Of the Tenth Circuit, sitting by designation.

**SELYA**, **Circuit Judge**. Faced with a motion for a preliminary injunction, the district court held an evidentiary hearing, reserved decision, and thereafter granted the requested relief. Waldron v. Geo. Weston Bakeries, Inc., 575 F. Supp. 2d 271, 273 (D. Me. 2008). That ukase is the focal point of this appeal.

We rehearse the facts as found by the district court, consistent with record support. The plaintiffs, Robert Waldron and Christopher Mills, are citizens of Maine who own exclusive rights to purchase and distribute, within designated geographic territories or "routes," baked goods purveyed by the defendants, George Weston Bakeries Inc. and George Weston Bakeries Distribution Inc. (collectively, Weston). Each of these affiliated firms is a Delaware corporation that maintains its principal place of business in Pennsylvania.

The terms of the arrangement between the parties are limned in standard-form distribution agreements. Under these agreements, each plaintiff agrees, in substance, to purchase from Weston and re-sell bakery products; to develop and maximize sales; and to cooperate with Weston in marketing programs. In turn, Weston grants each plaintiff an exclusive route; agrees to supply baked goods for sale along that route; and promises to assist in the route-holder's marketing endeavors.

The distribution agreements are of unlimited duration and specify that the plaintiffs will work as independent contractors. Nevertheless, the relationship is one of mutual dependence. It is nose-on-the-face plain that each party must rely on the other's performance.

Over time, the bond between the plaintiffs and Weston became frayed. In April of 2005, a number of route-holders (including the plaintiffs) accused Weston of a gallimaufry of allegedly unfair business practices. For the most part, these complaints grew out of the route-holders' conviction that Weston was exercising a degree of operational control that was inconsistent with its promise to treat them as independent contractors. That lawsuit came to naught. See Gagne v. Geo. Weston Bakeries Distrib., Inc., No. 05-77, 2006 WL 1636001, at *1 (D. Me. June 6, 2006).

Despite this defeat, the plaintiffs persisted in pursuing their perceived plaints. In 2006, they sued Weston in a Maine state court, alleging breach of contract, unconscionability, and violations of various statutes.[1] Once again, the action centered on the degree of control that Weston was attempting to exercise over the route-holders. After a bench trial, the state-court judge upheld the distribution agreements against the claim of

_____

[1] The 2006 case was removed to the federal district court and then remanded. These details need not concern us.

unconscionability and concluded that Weston had not breached those agreements.  The plaintiffs filed a timely notice of appeal.

On July 10, 2008 — one day before the deadline for submitting the plaintiffs' appellate brief — their counsel pressed for settlement.  The lawyer's efforts are chronicled in exquisite detail in the district court's rescript, see Waldron, 575 F. Supp. 2d at 273-74, and it would serve no useful purpose to repastinate that well-ploughed soil.  We focus instead on the critical communication: a voicemail message left by the plaintiffs' lawyer for defense counsel.  Having demanded $5,000 to settle the pending litigation, the plaintiffs' lawyer warned:

> My clients are not going to put this behind them regardless of how the appeal comes out. That is, there will be information provided to the appropriate taxing authorities, workers compensation board, etc. If we're not able to come to a mutually agreeable settlement today, and I understand that's quick but we're talking about $5,000, Jim, which is much less than what it'll cost your client to work on this appeal.  If the . . . settlement is not agreeable then all bets are off.  There will be no offer of settlement beyond today and your clients can expect to continue to be involved in some type of hearings of some nature, proceedings of some nature in the near future regarding their status of an employer as opposed to an independent business entity or there can be a settlement.  I hope that's the way we go.

Weston did not accept the proffered settlement, and the record is tenebrous as to the fate of the appeal.

A few days after the proposed settlement cratered, Weston pounced. It terminated the plaintiffs' distribution agreements on the basis of section 8.2 thereof, which gave Weston a right to terminate immediately, without an opportunity to cure, if the route-holder's actions "involve[] criminal activity or fraud, threaten[] public health or safety, or threaten[] to do significant harm" to Weston. Each termination notice referred to the voicemail and stated in pertinent part that: "It is the position of [Weston] that your threat to do significant harm to [Weston] if it does not meet your [settlement] demand constitutes a non-curable breach of your Distribution Agreement." Weston proceeded to assume control of the plaintiffs' routes.

The plaintiffs did not submit meekly to this preemptive strike but, rather, sued Weston in a Maine state court. Their complaint contained four substantive counts: breach of contract, tortious interference with advantageous economic relations, restraint of trade, and breach of an implied covenant of good faith and fair dealing. A fifth count requested a declaratory judgment on the claim of wrongful termination. The plaintiffs simultaneously moved for a preliminary injunction.

Weston removed the action to the federal district court on the basis of diversity of citizenship and the existence of a controversy in the requisite amount. See 28 U.S.C. §§ 1332(a)(1), 1441. That court convened an evidentiary hearing on the motion for

-5-

injunctive relief.  Following that hearing and an exchange of legal memoranda, the court issued a preliminary injunction restoring the plaintiffs to their routes and suspending Weston's attempted termination of the distribution agreements pendente lite.  The court found that the plaintiffs not only had established a likelihood of success on their contract and implied covenant claims but also had satisfied the other requirements for preliminary injunctive relief.  See Waldron, 575 F. Supp. 2d at 277-79. This interlocutory appeal ensued.  We have jurisdiction under 28 U.S.C. § 1292(a)(1).

When a party appeals from the grant or denial of a preliminary injunction, review is for abuse of discretion.  Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996).  Within that framework, we scrutinize the district court's findings of fact for clear error and its handling of abstract legal questions de novo.  Coquico, Inc. v. Rodríguez-Miranda, 562 F.3d 62, 66 (1st Cir. 2009); Air Line Pilots Ass'n, Int'l v. Guilford Transp. Indus., Inc., 399 F.3d 89, 95 (1st Cir. 2005).  In the gray area between those two poles, we afford considerable deference to the trial court's balancing of equities.  Coquico, 562 F.3d at 66.  We will set aside such judgment calls only if the trier has "ignored pertinent elements deserving significant weight, considered improper criteria, or, though

assessing all appropriate and no inappropriate factors, plainly erred in balancing them." Ross-Simons, 102 F.3d at 16.

We recently explained that "[t]he propriety of preliminary injunctive relief depends on an amalgam of four factors: (i) the likelihood that the movant will succeed on the merits; (ii) the possibility that, without an injunction, the movant will suffer irreparable harm; (iii) the balance of relevant hardships as between the parties; and (iv) the effect of the court's ruling on the public interest." Coquico, 562 F.3d at 66. The first factor — likelihood of success — normally will weigh the heaviest in this four-part decisional calculus. New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002).

Here, another familiar principle comes to mind. We have reiterated several times that when a district court adroitly takes the measure of a case and articulates a persuasive rationale in disposing of it, there is scant need for a reviewing court to write at length merely to hear its own words resonate. See, e.g., Vargas-Ruíz v. Golden Arch Dev., Inc., 368 F.3d 1, 2 (1st Cir. 2004); Cruz-Ramos v. P.R. Sun Oil Co., 202 F.3d 381, 383 (1st Cir. 2000); Holders Capital Corp. v. Cal. Union Ins. Co. (In re San Juan Dupont Plaza Hotel Fire Litig.), 989 F.2d 36, 38 (1st Cir. 1993). This is just such an instance: the court below made supportable findings of fact on the relevant issues, applied the law faithfully to the discerned facts, and exercised its discretion in an

appropriate manner.  It set out these findings and conclusions with admirable clarity and tied them together with a plausible rationale justifying the issuance of a preliminary injunction.  No more was exigible.  Hence, we affirm the judgment below essentially for the reasons advanced in the district court's thoughtful rescript.  We add only a few comments directed to the plaintiffs' likelihood of success on the merits.

**First**.  Weston hinges its right to terminate the distribution agreements on the voicemail "threat" to inform tax and workers' compensation authorities about its treatment of the route-holders as employees.  Weston posits that this "threat" transgressed section 8.2 of the agreements, quoted supra, because it constituted extortion (and, thus, constituted a breach that involved criminal activity).  The district court rejected that assertion, Waldron, 575 F. Supp. 2d at 277, and so do we.

Maine law defines extortion as a threat to do any act that would "not in itself substantially benefit the person but that would harm substantially any other person with respect to that person's health, safety, business, calling, career, financial condition, reputation, or personal relationships." Me. Rev. Stat. Ann. tit. 17-A, § 355.  Weston argues that the threatened acts could not inure to the plaintiffs' benefit because (a) in an earlier round of litigation, the state court had already determined the plaintiffs' work status, and (b) even if the administrative

agencies found the plaintiffs to be employees, the terms of the distribution agreements would require that the parties adjust their relationship to that of independent contractors.

In their breach of contract and breach of implied covenant counts, the plaintiffs said, in effect, that this claim of extortion was chimerical. In finding that the plaintiffs had established a likelihood of success on these counts, the lower court found that this unflattering characterization of the supposed "extortion" was accurate. That finding was based upon neither an error of law nor a clearly erroneous appraisal of the facts.

We begin by disposing of a straw man. Contrary to Weston's importunings, the judgment in the earlier litigation did not give rise to res judicata. We explain briefly.

Under Maine law, res judicata applies to an attempt at relitigation of a claim that was previously determined (or which could have been determined) by a final judgment in an earlier case between the same parties or their privies, arising out of the same transaction or set of facts. See, e.g., FPL Energy Me. Hydro LLC v. FERC, 551 F.3d 58, 63 (1st Cir. 2008); Benjamin v. Aroostook Med. Ctr., Inc., 113 F.3d 1, 2 (1st Cir. 1997). Here, no governmental body was a party to the earlier case, and the prior adjudication did not extend to rights and obligations under tax or workers' compensation laws. See Waldron v. Geo. Weston Bakeries, Inc., No. CV-06-502, slip op. at 21 (Me. Super. Ct., Apr. 8, 2008)

(unpublished) (explaining that "no tax or labor or workers' compensation laws are invoked in this case").

We deal next with the underpinnings of the lower court's factfinding. The court supportably determined that the plaintiffs' tax and workers' compensation allegations were colorable. <u>See</u> <u>Waldron</u>, 575 F. Supp. 2d at 275 n.1. Moreover, should the plaintiffs be reclassified as employees, Weston would be responsible for paying a number of tax and related charges that could potentially inure to the plaintiffs' benefit. <u>See</u>, <u>e.g.</u>, 26 U.S.C. § 3301 (dealing with unemployment tax); <u>id.</u> § 3111 (dealing with Social Security and Medicare). Finally, even if the state agencies were to make no direct award, the plaintiffs would stand to gain from the clarification of their work status — a clarification that they had long been litigating to achieve. To avoid characterization as extortion, the benefit received need not be pecuniary. <u>See</u>, <u>e.g.</u>, <u>People</u> v. <u>Garland</u>, 505 N.E.2d 239, 240 (N.Y. 1987) (deeming contractual rights "property" within purview of similarly-phrased extortion statute).

We add a coda. Trying to transmogrify what was obviously a settlement demand in a pending civil case into an act of extortion is like trying to fit a square peg into a round hole. If given widespread credence, that tactic would severely impede the salutary policies favoring settlements in civil actions.

-10-

**Second**. Alternatively, Weston asserts that the voicemail "threat" justified repudiation of the distribution agreements because section 8.2, quoted supra, allowed it to end the relationship if a route-holder threatened to do "significant harm" to Weston. Weston identifies the so-called "significant harm" as the cost of defending against future administrative proceedings. It also suggests that significant harm results from the quid pro quo nature of the settlement demand.

The district court found these assertions baseless. Waldron, 575 F. Supp. 2d at 277. That assessment is not clearly erroneous.

We need not tarry. The cost of defending against future administrative proceedings might be relevant if such proceedings were initiated without any semblance of cause or in bad faith.[2] Cf. Cimenian v. Lumb, 951 A.2d 817, 820 (Me. 2008) (authorizing award of attorneys' fees for frivolous claims in "extraordinary circumstances"). Here, however, the district court supportably found the opposite. See id. at 275 n.1, 277. Surely, a contractual provision that allowed a party with superior bargaining power to terminate simply because its distributor made a colorable, good-faith complaint to a government agency would be unenforceable as an

---

[2] Even so, the record here is devoid of any evidence that Weston's anticipated defense would be costly or would otherwise significantly harm the company.

-11-

affront to public policy.  See, e.g., Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 33 (1991).

Weston's insistence that the quid pro quo nature of the proposal constitutes significant harm is equally untenable.  By definition, every settlement proposal embodies a quid pro quo.  Like any other party embroiled in a civil litigation, Weston was free at all times to assess its options and accept or decline the settlement offer as it saw fit.

To be sure, Weston also raises the specter of blackmail.  But this hyperbole is little more than a reconfiguration of its claim that the voicemail amounted to extortion.  The argument is no more appealing in this new configuration.

**Third**.  While calumnizing the conduct of the plaintiffs' lawyer, Weston repeatedly refers to canons of ethics and rules of professional responsibility.  In our view, these canons and bar rules are largely beside the point.  Assuming without deciding that an ethical lapse occurred and that it could be attributed to the plaintiffs — both assumptions of dubious validity — Weston has not convincingly explained how such a lapse would trigger section 8.2 of the distribution agreements.  Certainly, a lawyer's unethical conduct is not a fungible proxy for a client's criminal activity.

To sum up, the district court's judgment as to the plaintiffs' likelihood of success is consistent with the law and the discerned facts.  That judgment represents a reasonable prediction

of the probable outcome of the litigation.  <u>See</u>, <u>e.g.</u>, <u>Narragansett</u> <u>Indian Tribe</u> v. <u>Guilbert</u>, 934 F.2d 4, 6 (1st Cir. 1991).  The district court's conclusions on the other three elements that enter into the preliminary injunction calculus are plausible.

We need go no further.  Given the district court's findings, the issuance of a preliminary injunction was altogether appropriate.

**<u>Affirmed</u>**.