# United States Court of Appeals
## For the First Circuit

---

Nos. 17-2165, 17-2166, 17-2167

IN RE: THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as representative for the Commonwealth of Puerto Rico; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as representative for the Puerto Rico Highways & Transportation Authority,

Debtors.

---

PEAJE INVESTMENTS LLC,

Plaintiff, Appellant,

v.

THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as representative for the Puerto Rico Highways & Transportation Authority; HON. CARLOS CONTRERAS-APONTE, in his official capacity as Executive Director of Puerto Rico Highways & Transportation Authority; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, as representative for the Commonwealth of Puerto Rico; HON. RICARDO ROSSELLO NEVARES, in his official capacity as Governor of the Commonwealth of Puerto Rico; HON. RAUL MALDONADO GAUTIER, in his official capacity as Secretary of Treasury of the Commonwealth of Puerto Rico; HON. JOSE IVAN MARRERO ROSADO, in his official capacity as Executive Director of the Office of Management & Budget; PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY; HON. GERARDO JOSE PORTELA FRANCO, in his official capacity as Executive Director of the Puerto Rico Fiscal Agency and Financial Advisory Authority,

Defendants, Appellees.

---

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Laura Taylor Swain, U.S. District Judge[*]]

———————————

Before

Howard, Chief Judge,
Kayatta, Circuit Judge,
and Torresen, Chief U.S. District Judge.[**]

———————————

G. Eric Brunstad, Jr., with whom Allan S. Brilliant, Robert J. Jossen, Andrew C. Harmeyer, Dechert LLP, Dora L. Monserrate Peñagarícano, and Monserrate Simonet & Gierbolini, LLC were on brief, for appellant.

Jeffrey W. Levitan, with whom Timothy W. Mungovan, Martin J. Bienenstock, Stephen L. Ratner, Mark D. Harris, Michael A. Firestein, Lary A. Rappaport, John E. Roberts, Proskauer Rose LLP, Hermann D. Bauer, and O'Neill & Borges LLC were on brief, for appellees The Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico and the Puerto Rico Highways and Transportation Authority.

John J. Rapisardi, Peter Friedman, Elizabeth L. McKeen, and O'Melveney & Myers LLP, on brief for appellees Puerto Rico Fiscal Agency and Financial Advisory Authority and Hon. Gerardo Jose Portela Franco.

Raul Castellanos and Development & Construction Law Group LLC on brief for appellee Hon. Carlos Contreras Aponte.

Wanda Vázquez Garced, Secretary of Justice, Luis R. Román Negrón, Solicitor General of Puerto Rico, Department of Justice, on brief for appellees Hon. Ricardo Antonio Roselló Nevares, Hon. Raúl Maldonado Gautier, and Hon. José Iván Marrero Rosado.

———————————

August 8, 2018

———————————

———————————

[*]Of the Southern District of New York, sitting by designation.
[**]Of the District of Maine, sitting by designation.

**KAYATTA**, <u>Circuit Judge</u>.  We are asked for the second time to weigh in on Peaje Investments LLC's claim that what it characterizes as its "collateral" is being permanently impaired. Peaje is the beneficial owner of $65 million of uninsured bonds issued by the Puerto Rico Highways and Transportation Authority ("Authority").  Peaje alleges that its bonds are secured by a lien on certain toll revenues of the Authority and that, in response to Puerto Rico's financial crisis, the Authority and the Commonwealth of Puerto Rico ("Commonwealth") are diverting funds to which Peaje believes it is entitled under the lien and using them for purposes other than paying the bonds.  Because both the Authority and the Commonwealth have commenced bankruptcy cases under Title III of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), 48 U.S.C. §§ 2101–2241, Peaje instituted the adversary proceedings now on consolidated appeal to challenge this diversion.  Despite the novelty and complexity of the bankruptcies from which this case arose, three narrow rulings dispose of the appeal now before us:  First, the district court did not abuse its discretion in limiting Peaje to its argument that it holds a statutory lien on certain toll revenues of the Authority.  Second, Peaje does not hold such a lien.  And third, we vacate the district court's alternative reasons for denying relief so that they may be reconsidered de novo on a comprehensive, updated record now that it is clear that Peaje has no statutory lien.

- 3 -

The Authority was formed in 1965 as a public corporation and instrumentality of the Commonwealth. Pursuant to its enabling act ("Act" or "Enabling Act"), it may borrow money, issue bonds, and secure those bonds with pledges of revenues. P.R. Laws Ann. tit. 9 § 2004(l). In 1968, the Authority adopted Resolution No. 68-18 (the "1968 Resolution" or the "Resolution"). See Puerto Rico Highway Authority, Resolution No. 68-18, available at http://gdb.pr.gov/investors_resources/documents/FIRMDM-12808969-v1-PRHTA1968Resolution.pdf. In order to provide additional funds for the construction of roads, bridges, and other facilities, the 1968 Resolution provided for the issuance of bonds. Id. Art. II, § 201.

The Resolution guaranteed that the Authority would "promptly pay the principal of and the interest on every bond issued," but that it would do so "solely from Revenues and from any funds received by the Authority for that purpose from the Commonwealth which Revenues and funds are hereby pledged to the payment thereof in the manner and to the extent" provided by the Resolution. Id. Art. VI, § 601. The Resolution established a special account called the "Sinking Fund," which itself contains three separate accounts: the Bond Service Account, the Redemption Account, and the Reserve Account. Id. Art. IV, § 401. The revenues (and any other pledged funds) deposited in these accounts

were to be held in trust by the "Fiscal Agent," a bank or trust company appointed by the Authority, until, in the case of the Bond Service Account, they were applied to the principal and interest due on the bonds. Id. Art. IV, § 402. Pending the application of these funds, the Resolution provided that the money "shall be subject to a lien and charge in favor of the holders of the bonds . . . and for the further security of such holders until paid out or transferred." Id. Art. IV, § 401. Peaje is the beneficial owner of various bonds issued pursuant to the 1968 Resolution, with maturity dates ranging from 2023 to 2036. Peaje's basic position is that it holds, as security for its bonds, a lien on toll revenues generated from three specific highways maintained by the Authority. It further contends that its lien extends not just to toll revenues currently held by the Fiscal Agent, but also to the Authority's toll revenues before they are deposited with the agent.[1]

In April 2016, in response to growing economic problems in Puerto Rico, the Commonwealth enacted the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, pursuant to which then-Governor Alejandro García-Padilla issued several executive orders that suspended the Authority's obligation to deposit toll

---

[1] Peaje contends that its lien also extends to certain tax revenues of the Authority. However, this portion of Peaje's purported lien is not at issue in this appeal.

revenues with the Fiscal Agent. Peaje contends that, as a result, the Authority and the Commonwealth began using the toll revenues for purposes other than those allowed by the Resolution, including to pay operating expenses. In July 2016, Peaje filed suit in district court to challenge this diversion of funds. But Congress had just enacted PROMESA, instituting a temporary stay of all proceedings against the Commonwealth and its instrumentalities. See 48 U.S.C. § 2194(b). Peaje therefore requested relief from the temporary stay, pursuant to PROMESA section 405(e)(2), 48 U.S.C. § 2194(e)(2), patterned after section 362(d) of the bankruptcy code ("Code"), 11 U.S.C. § 362(d). The district court denied relief, Peaje Invs. LLC v. Garcia-Padilla, Nos. 16-2365-FAB, 16-2384-FAB, 16-2696-FAB, 2016 WL 6562426, at *6 (D.P.R. Nov. 2, 2016), and we affirmed in relevant part, Peaje Invs. LLC v. García-Padilla, 845 F.3d 505, 514, 516 (1st Cir. 2017) (Peaje I).

After PROMESA's temporary stay expired, Peaje filed a second action in district court in May 2017 seeking similar relief. But soon afterward, the Authority, acting through the Financial Oversight and Management Board, filed a bankruptcy petition under Title III of PROMESA. (The Commonwealth had already filed its Title III petition.) This petition triggered an automatic stay (this time for the pendency of the bankruptcy case) of all actions against the Authority, including Peaje's second suit. See 11 U.S.C. §§ 362(a), 922(a); see also 48 U.S.C. § 2161(a)

- 6 -

(incorporating 11 U.S.C. §§ 362(a) and 922(a) into PROMESA).[2] Peaje then timely exercised its right to file an adversary proceeding seeking declaratory and injunctive relief in the jointly administered bankruptcy cases of the Authority and the Commonwealth.[3]

Specifically, Peaje asserted the following claims in two identical verified complaints, filed in the respective Title III cases of the Authority and the Commonwealth: (1) a declaration that the Authority's toll revenues qualify as "pledged special revenues" under Code section 922(d); (2) adequate protection or, in the alternative, relief from the stay; (3) a declaration that Code section 922(d) preempts fiscal plan implementation; (4) a declaration that Code section 922(d) requires the Authority to deposit toll revenues with the Fiscal Agent; (5) a declaration that neither Code section 552 nor 928(b) apply to its bonds; (6) a declaration that to the extent Code section 928(b) applies to its bonds, netting out "necessary operating expenses" would constitute

---

[2] Although neither party addresses this point, the automatic stay under Code section 362 applies to proceedings against the debtor, while the automatic stay under Code section 922 applies to proceedings against officers or inhabitants of the debtor. See 11 U.S.C. §§ 362(a), 922(a); see also In re Jefferson Cty., 474 B.R. 228, 248 (Bankr. N.D. Ala. 2012). Both provisions are implicated here because Peaje has sued the Authority and the Commonwealth, as well as individual officers in the government of Puerto Rico.

[3] In the time since Peaje filed the adversary proceedings now on appeal, the Authority has defaulted on its bond payments.

a taking in violation of the Constitution; (7) relief from the stay so that it can challenge, on constitutional grounds, the diversion of toll revenues; and (8) injunctive relief requiring the Authority to resume depositing the toll revenues with the Fiscal Agent.

Along with its complaints, Peaje filed a motion for a temporary restraining order ("TRO") enjoining the Authority from continuing to divert the toll revenues.[4] The motion also sought relief from the automatic bankruptcy stay or, in the alternative, adequate protection. As we discuss more fully below, Peaje argued in its request for a TRO that it was entitled to relief because it holds a statutory lien on the Authority's toll revenues. The district court, to which we will hereinafter refer as the Title III court, held a preliminary hearing on Peaje's motion and defendants then filed an opposition brief in which they challenged Peaje's assertion of a statutory lien on the merits.[5]

---

[4] This application was later converted into a motion for a preliminary injunction.

[5] Defendants also raised PROMESA section 305, 48 U.S.C. § 2165, as a bar to the relief sought by Peaje. This issue seems to have fallen by the wayside, garnering no mention in the district court's opinion and no further advocacy by defendants on appeal. Our opinion issued today in Financial Oversight and Management Board for Puerto Rico v. Ad Hoc Group of PREPA Bondholders (In re Financial Oversight and Management Board for Puerto Rico), No. 17-2079 does address the meaning and effect of section 305.

After Peaje filed its Reply in the Title III court, defendants moved, on waiver grounds, to strike from that brief all assertions related to Peaje's alternative argument that it holds a non-statutory lien. The Title III court, relying on Local Civil Rule 7(c), granted the motion to strike on the grounds that Peaje had failed to argue, prior to its Reply, that it holds a non-statutory lien. See P.R.L.Cv.R. 7(c) (a reply memorandum "shall be strictly confined to replying to new matters raised in the objection or opposing memorandum"); see also P.R. LBR 1001-1(b) (incorporating local rules of the District of Puerto Rico into the local bankruptcy rules). After an evidentiary hearing, the Title III court issued a second order denying both Peaje's request for a preliminary injunction and its request for adequate protection or, alternatively, relief from the stay. See Peaje Invs. LLC v. P.R. Highways & Transp. Auth., 301 F. Supp. 3d 290, 293 (D.P.R. 2017). Peaje appeals from both orders.

## II.

We turn first to the Title III court's decision to grant defendants' motion to strike. We have previously reviewed similar orders for abuse of discretion. See Amoah v. McKinney, 875 F.3d 60, 62 (1st Cir. 2017); Turner v. Hubbard Sys., Inc., 855 F.3d 10, 12 (1st Cir. 2017). Presented with no argument to the contrary, we assume that the same standard applies here.

Some statutory context is necessary to understand Peaje's potential waiver. As we explain more fully in the next section of this opinion, the Code divides liens into three mutually exclusive categories, two of which are relevant here: statutory liens and security interests.[6] Two provisions of the Code, incorporated into PROMESA, see 48 U.S.C. § 2161(a), single out certain types of liens (specifically, security interests) for special treatment. First, Code section 552(a) establishes a general rule, subject to several exceptions not relevant here, see 11 U.S.C. § 552(b), that property acquired by the debtor after the commencement of the bankruptcy case "is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 552(a); see also Assured Guar. Corp. v. Commonwealth of Puerto Rico (In re Fin. Oversight and Mgmt. Bd. of P.R.), 582 B.R. 579, 593 (D.P.R. 2018). Second, Code section 928(a) provides an exception to section 552(a)'s general rule for "special revenues acquired by the debtor after the commencement of the case." 11 U.S.C. § 928(a). Such revenues "shall remain subject to any lien resulting from any security agreement entered into by the debtor

---

[6] Defendants have consistently referred to Peaje's alternative position as a consensual lien. But the Code's definitions section does not use this language, instead identifying a lien arising out of a contractual arrangement as a security interest. We use the latter term.

- 10 -

before the commencement of the case."  Id.  Code section 928(b) allows debtors to offset "necessary operating expenses" from "[a]ny such lien on special revenues."  Id. § 928(b).  As the text of both provisions makes clear, the general rule of section 552(a) and its exception in section 928(a) apply only to a "lien resulting from [a] security agreement."[7]  Id. §§ 552(a), 928(a).  Neither provision applies to statutory liens.  See 5 Collier on Bankruptcy ¶ 552.01[2] (16th ed.); 6 id. ¶ 928.02[2].  Thus, Peaje's rights in the Title III proceeding differ considerably depending on whether it possesses a statutory lien or a lien resulting from a security agreement (i.e., a security interest).

With this framework in mind, we find that the district court did not abuse its discretion in granting the motion to strike.  We begin where these adversary proceedings began, with the filing of the verified complaints.  In its complaints, Peaje alleged, among other things:

> [T]he 1968 Bondholders' lien results from both the Enabling Act that created HTA and the binding municipal resolution governing Plaintiff's Bonds.  Thus, that lien is a "statutory lien" within the meaning of Section 101(53) of the Bankruptcy Code, 11 U.S.C. § 101(53).

---

[7] "The term 'security agreement' means [an] agreement that creates or provides for a security interest." 11 U.S.C. § 101(50). Because the definition of "security agreement" incorporates the concept of a security interest, we, like the parties, use the two terms interchangeably.

Peaje then went on to explicitly disclaim that Code sections 928 and 552(a) applied to its lien:

> As a result, Section 552 of the Bankruptcy Code does not apply to Plaintiff's Bonds, as the application of that provision is limited to "lien[s] resulting from any security agreement . . . [,]" see 11 U.S.C. § 552(a). . . . Nor does Section 928(b) of the Bankruptcy Code apply to those Bonds. That provision in some instances subordinates a bondholder's lien on "special revenues" to the "necessary operating expenses" of the "project or system" that generates those revenues, but is also limited in application to "lien[s] resulting from any security agreement["] . . . .

Later in its complaints, Peaje reaffirmed that its lien was "unaffected by Section 928(b) because that lien does not result from a security agreement within the meaning of that provision." Peaje made similar statements regarding section 552.

Next, in its application for a TRO, filed the same day as the verified complaints, Peaje again argued that its "lien on the Toll Revenues [was] unaffected by Section 928(b) because that lien does not result from a security agreement within the meaning of that provision."

Then in the initial hearing on Peaje's request for a TRO, held on June 5, 2017, Peaje's attorney stated:

> There is not a security interest here. There is not a voluntary security agreement like you would see under Article 9. . . . This is not a security agreement or security interest under Article 9. This is a lien that is established pursuant to a municipal ordinance.

So, in three separate contexts prior to filing its Reply, Peaje explicitly denied that it held a security interest.

And yet, as Peaje points out, the comments quoted above from the June 5 hearing were sandwiched between two statements suggesting a broader assertion of lien rights. First, Peaje stated: "We don't say in our papers that we have a statutory lien or nothing. We say that we have a lien. We say that this lien arises from a municipal ordinance." And later, it continued: "We say this is a lien, first and foremost."

On the other hand, had Peaje been proceeding on the alternative theory that it should be granted relief to protect its interests secured by a security agreement rather than a statutory lien, one would have expected to see an explanation for how to accommodate the effects of Code section 928(b), including an analysis of what constituted necessary operating expenses. And while Peaje's attorney asserted in the June 5 hearing that to the extent the Authority could surcharge its lien, it could do so only to a limited extent to account for the expenses necessary for generating the revenue stream, this argument was absent from Peaje's actual filing. In its motion for a TRO, Peaje rested primarily on its position that Code sections 552 and 928(b) left its lien "unaffected" because it is a statutory lien. To the extent it offered any alternative argument, it argued only that

the application of section 928(b) would be unconstitutional because it would convert Peaje's gross lien into a net lien. The constitutional argument, whether correct or not, is hardly so self-evident as to have avoided any need to engage more seriously with the potential application of section 928(b) in order to advance the alternative argument that Peaje held a security interest. Peaje also did not explain why the sources that allegedly established its lien (the Enabling Act and the 1968 Resolution) supported the contention that Peaje's lien should be categorized alternatively as a security interest. All of this puts Peaje's claim of preservation on precarious grounds. Moreover, Peaje clearly understood how to adequately preserve an alternative argument, as evidenced by its very different approach on another issue: the application of the automatic stay to its claims, a question we need not reach today. In its motion for TRO, Peaje explicitly and repeatedly argued that the automatic stay did not apply to its case. But it also argued that, to the extent the stay did apply, it sought "out of an abundance of caution" relief from that stay.

Peaje argues that defendants conceded, both in this case and in related proceedings, that Peaje holds a lien of some type. There are, indeed, documents in the record, including bond offering statements from the Authority, reflecting that bonds issued under the 1968 Resolution are secured by a pledge of certain revenues of

the Authority. But even assuming that defendants to some extent have conceded the existence of a lien, Peaje does not argue, nor could it, that defendants have conceded that Peaje holds a lien on the post-petition revenues it now seeks to obtain. Cf. Peaje I, 845 F.3d at 514 ("While Peaje may have had a contractual right to monthly deposits with the fiscal agent and the maintenance of the accounts at particular levels, its protected interest for purposes of the lift-stay motion was limited to its interest in repayment of the debt owed."). Nor does Peaje contend that defendants conceded the existence of a particular type of lien, which, as noted, has important consequences for the issues in this case.

In sum, whether Peaje waived its non-statutory lien argument is admittedly a close call. One can easily see why the statements to which the Title III court pointed made it appear that Peaje was limiting itself to asserting a statutory lien. At the same time, however, the mutually exclusive nature of a security interest and a statutory lien under the Code invited Peaje's counsel to characterize its lien as statutory (and thus by definition not a security interest), without intending to waive the logically alternative argument, which defendants' prior statements in Peaje I had not made an obvious subject of dispute. See Peaje I, 845 F.3d at 510 (observing without deciding that Peaje's bonds are secured by a lien on toll revenues without specifying the nature of the lien).

Ultimately, what gives us confidence that the Title III court did not abuse its discretion in granting the motion to strike is the fact that any waiver here is not permanent, a point that the Title III court itself made. Moreover, even were we to rule in favor of Peaje on this issue, and thus consider the other issues on appeal based on the premise that Peaje holds a security interest, the most Peaje could realistically expect to gain is a remand to take a renewed shot at obtaining relief on a supplemented record that reflects where matters now stand. For the reasons we explain in Part IV of this opinion, that is exactly what Peaje gets.

We therefore affirm the Title III court's holding that, for purposes of the motion now on review, Peaje has limited itself to arguments predicated upon its claim that it holds a statutory lien on the Authority's toll revenues.

### III.

We turn now to the pivotal issue that Peaje presented below and raises on appeal: Does it have a statutory lien on any property of the Authority? The district court resolved this issue in the context of analyzing Peaje's request for a preliminary injunction, a ruling that we review overall for abuse of discretion. See Waldron v. George Weston Bakeries Inc., 570 F.3d 5, 8 (1st Cir. 2009). But since the proper classification of Peaje's purported lien is a legal question, we review it de novo.

- 16 -

See _id._ ("Within that [abuse of discretion] framework, we scrutinize the district court's . . . handling of abstract legal questions de novo.").

The Code defines a lien as a "charge against or interest in property to secure payment of a debt or performance of an obligation."  11 U.S.C. § 101(37).  It then divides liens into three mutually exclusive categories:  judicial liens, statutory liens, and security interests.  The Code defines a statutory lien as:

> a lien arising solely by force of a statute on specified circumstances or conditions, or lien of distress for rent, whether or not statutory, but does not include security interest or judicial lien, whether or not such interest or lien is provided by or is dependent on a statute and whether or not such interest or lien is made fully effective by statute.

_Id._ § 101(53) (footnote omitted).  _Collier on Bankruptcy_ describes the "essence" of a statutory lien as "the need, or lack of need, for an agreement or judgment to create the lien."  2 _Collier_, _supra_, ¶ 101.53.  It goes on:

> If the lien arises by force of statute, without any prior consent between the parties or judicial action, it will be deemed a statutory lien. . . . If the creation of the lien is dependent upon an agreement, it is a security interest even though there is a statue which may govern many aspects of the lien.  The fact that a statute describes the

- 17 -

> characteristics and effects of a lien does not
> by itself make the lien a statutory lien.

Id.

Peaje argues that it holds a statutory lien by virtue of the Enabling Act.  See P.R. Laws Ann. tit. 9 §§ 2001–2035.  It points to various provisions of the Act that it claims "provide[] for [its] lien on the circumstances and conditions identified in its provisions."  But none of the provisions Peaje cites supports this assertion.  Under the Act:

> [T]he Authority is hereby empowered to . . . borrow money for any of its corporate purposes, and to issue bonds of the Authority in evidence of such indebtedness and to secure payment of bonds and interest thereon by pledge of, or other lien on, all or any of its properties, revenues or other income . . . .

P.R. Laws Ann. tit. 9 § 2004, (l).  The Act further specifies that "the Authority may from time to time issue and sell its own bonds," id. § 2012(a), and that those bonds "may be authorized by resolution or resolutions of the Authority," id. § 2012(b).  As to the pledging of revenues, the Act provides:

> Any resolution or resolutions authorizing any bonds may contain provisions, which shall be a part of the contract with the holders of the bonds:
> (1) As to the disposition of the entire gross or net revenues and present or future income or other funds of the Authority, including the pledging of all or any part thereof to secure payment of the principal of and interest on the bonds . . . .

- 18 -

Id. § 2012(e). Finally, section 2015 of the Act provides that, with some limited exceptions, the bonds issued by the Authority shall not be a debt of the Commonwealth, "nor shall such bonds or the interest thereon be payable out of any funds other than those pledged for the payment of such bonds and interest thereon pursuant to the provisions of § 2004(l) of this title." Id. § 2015.

As the Title III court found, these provisions permit the Authority to secure the payment of bonds by making a pledge of revenues, but they do not require that it do so. Even the language of section 2015 of the Act applies only to funds "pledged . . . pursuant to . . . § 2004(l)," id. § 2015, and such pledges are voluntary. See id. § 2004(l) (the Authority is "empowered" to issue bonds and secure them with pledges of revenues); see also id. § 2012(e) (a resolution authorizing bonds "may contain provisions" pledging revenues (emphasis added)). We therefore agree with the district court that "[n]o lien arises solely by force of [these] statutory provision[s]."

Peaje counters that a statutory lien need not be specified "exclusively and formally in some statutory text." Rather, Peaje argues, the Code provides that a statutory lien can arise from specified circumstances or conditions and, in its view, these include "regulatory elaboration and agency action." Peaje is correct about the definition but wrong about its application.

Under the Code, a statutory lien "aris[es] solely by force of a statute on specified circumstances or conditions." 11 U.S.C. § 101(53) (emphasis added). In other words, a statute can create a lien outright or it can establish that a lien will attach automatically upon an identified triggering event other than an agreement to grant the lien. See S. Rep. No. 95-989, at 27 (1978) ("A statutory lien is . . . one that arises automatically, and is not based on an agreement to give a lien or on judicial action."); see also Klein v. Civale & Trovato, Inc. (In re Lionel Corp.), 29 F.3d 88, 94 (2d Cir. 1994) (characterizing statutory liens as "liens that come into being as a result of statutory operation, without consent or judicial action"). Take two examples: contractors' liens and tax liens. See 2 Collier, supra, ¶ 101.53 (identifying contractors' liens and tax liens as "[g]ood examples of statutory liens"); see also S. Rep. No. 95-989, at 27 (same). Contractors' liens, also known as mechanics' liens, "are creatures of statute," in that they "arise and are created by force of statute." 53 Am. Jur. 2d Mechanics' Liens § 3. Every state has a mechanics' lien law. Id. § 6. While these laws vary considerably across jurisdictions, id. § 8, and often require certain procedures for recording and enforcing the lien, the general concept is that when an individual supplies labor, materials, or services to improve the property of another, his claim for payment becomes a lien on the owner's property. Id.

§ 12; see also id. § 1. Once a worker furnishes labor or materials, a statutory lien often arises automatically without any further action. See id. § 1. The same is true of a tax lien in favor of the federal government. See 26 U.S.C. § 6321 (establishing that when an individual liable for taxes "neglects or refuses to pay the same after demand, the amount . . . shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person"). For both mechanics' liens and tax liens, the relevant statute specifies a circumstance or condition (the furnishing of labor or the refusal to pay taxes after demand) and provides (often through the use of mandatory, "shall" language) that when the specified circumstance or condition is satisfied, the lien attaches.

The Enabling Act differs from these statutes in an important respect: A pledge of revenues does not attach automatically when the Authority passes a resolution issuing bonds. Rather, it arises only when the Authority chooses to grant it. Because the Act does not automatically trigger a lien upon the performance of a specified condition, apart from the Authority's decision to grant a lien, it does not create a statutory lien.[8]

---

[8] We are aware of contrary reasoning in Alliance Capital Mgmt. L.P. v. County of Orange (In re County of Orange), 189 B.R. 499 (C.D. Cal. 1995). See id. at 503 (finding the existence of a statutory lien, notwithstanding that the statute at issue "permits

- 21 -

Perhaps aware that it faces an uphill battle, Peaje's backup argument is that, even if the Enabling Act does not by itself create a statutory lien, the Act together with the 1968 Resolution does. Peaje is correct that the Resolution contains mandatory language suggestive of lien creation. See 1968 Resolution, Art. IV, § 401 (funds held by the Fiscal Agent "shall be subject to a lien and charge in favor of the holders of the bonds issued and outstanding under this Resolution and for the further security of such holders until paid out or transferred as herein provided"); id. Art. VI, § 601 (with some exceptions, "the principal, interest and premiums [of the bonds] are payable solely from Revenues and from any funds received by the Authority for that purpose from the Commonwealth which Revenues and funds are hereby pledged to the payment thereof"). But the Resolution poses a new problem for Peaje -- to quote the Title III court, "the 1968 Resolution is not a statute."

Peaje's only response is to point to a case holding that a regulation adopted by a Commonwealth regulatory agency, the Department of Natural and Environmental Resources, had "the same legal status as a law passed by the legislature." Armstrong v. Ramos, 74 F. Supp. 2d 142, 149 (D.P.R. 1999). The Title III court

---

the County to decide whether to pledge, and what to pledge" (emphasis in original)). Not bound in any way by that opinion, we find its reasoning unpersuasive and decline to rely on it.

was unpersuaded by the force of this analogy between an environmental regulation and a bond resolution passed by a public authority. The latter regulates no third-party conduct, imposes no burden on anyone other than the entity that issues it, and need not satisfy the public notice requirements generally applicable to agency regulations. Cf. Int'l Union, United Mine Workers of Am. v. Mine Safety and Health Admin., 407 F.3d 1250, 1259 (D.C. Cir. 2005) (APA notice and comment requirements serve to, among other things, "ensure fairness to affected parties" and give them an opportunity to object to a proposed rule). A resolution issued by a public corporation is much more akin to a resolution adopted by the board of a private corporation: The state grants the corporation the power to issue bonds and grant security interests, and the corporation then resolves whether and how to do so. Peaje offers no reason to view the origin of its bonds in any materially different manner.

In sum, Peaje does not hold a statutory lien. As anticipated by the parties, this conclusion, together with our conclusion that the Title III court did not abuse its discretion in construing the limited nature of Peaje's motion, resolves this appeal. With the only asserted lien (a statutory lien) found not to exist, for purposes of this appeal Peaje claims no relevant property interest necessary to compel relief from the automatic stay. See 11 U.S.C. § 362(d)(1) (requiring the bankruptcy court

- 23 -

to grant relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of [a] party in interest" (emphasis added)); id. § 922(b) (incorporating section 362(d) into section 922). Similarly, Peaje cannot establish a likelihood of success on the merits of its claims for declaratory and injunctive relief without an interest in the underlying toll revenues and was therefore not entitled to a preliminary injunction on the basis requested. See Bruns v. Mayhew, 750 F.3d 61, 65 (1st Cir. 2014) ("Because we hold that the appellants cannot succeed on the merits of their claim, we need not consider the likelihood of irreparable harm.").

## IV.

Before concluding, we address the Title III court's alternative bases for denying relief as set forth briefly in the court's opinion: that Peaje failed to establish irreparable harm and that defendants established adequate protection of Peaje's interests. Peaje's contention on appeal that the district court "inverted" the burden of proof for the adequate protection analysis is defied by the district court's conclusion "that the Defendants have met their burden of showing that Peaje's interest is adequately protected." Nevertheless, for two reasons, we think it necessary for the Title III court to revisit these rulings anew should Peaje on remand renew its requests for relief consistent with this opinion. First, we find it difficult to evaluate such

a brief treatment of two critical issues without understanding, at least, the Title III court's view as to the precise nature and extent of Peaje's collateral, its value at the time the Authority filed the bankruptcy petition, and the percentage of the toll revenues required in order to allow the toll highways to operate so as to generate future revenues. Second, the Title III court's analysis was necessarily sensitive to its view of how events would unfold, and much has transpired since September 2017, when it issued the order. We therefore vacate these two alternative findings, solely to make clear that they have no preclusive effect on remand. All that being said, nothing in this opinion should be read as implying any decision not expressly addressed within it.

## V.

For the foregoing reasons, we affirm both the Title III court's order granting defendants' motion to strike and the primary grounds for its order denying Peaje's request for a preliminary injunction and relief from the stay. We otherwise vacate and remand for further proceedings consistent with this opinion, including the resolution of any updated motions for relief Peaje should choose to file. No costs are awarded.